# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| THOMAS J. BRYAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 C 5472 |
| v. | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Thomas J. Bryan, brought this action pursuant to 42 U.S.C. § 405(g) (2008) for judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") (doc. # 1). By consent of the parties and pursuant to 28 U.S.C. § 636(c) (2005), the case was assigned to this Court for all proceedings, including the entry of final judgment (doc. # 11). Before the Court is plaintiff's motion for summary judgment.[1] For the following reasons, plaintiff's motion is granted and the case is reversed and remanded for further proceedings consistent with this decision.

---

[1] Plaintiff's motion for leave to file an oversized memorandum in support of his summary judgment motion (doc. #12) was granted before the case was reassigned here. Attached to that motion is plaintiff's memorandum in support of his motion for summary judgment (doc. #12-2). Plaintiff did not separately file a motion for summary judgment; we thus treat his memorandum as his motion. Plaintiff's memorandum is cited as "Pl.'s Mem."; defendant's response to plaintiff's brief in support of his motion for summary judgment is cited as "Deft.'s Resp." (doc. # 19); and plaintiff's reply memorandum in support of his motion for summary judgment is cited as "Pl.'s Reply" (doc. # 20).

## I.

Plaintiff applied for DIB on June 3, 2005, alleging disability since August 18, 2004 (R. 70, 74). His claim was denied on August 5, 2005 (R. 25, 42-45), and upon reconsideration on December 2, 2005 (R. 26, 49-52). He thereafter requested a hearing before an Administrative Law Judge ("ALJ") (R. 53), and on November 1, 2007, a hearing was conducted before ALJ Beverly Martin (R. 5-24). Plaintiff testified at the hearing, as did vocational expert ("VE") Leanne L. Hare (*id.*).

On February 22, 2008, the ALJ issued a partially favorable decision, finding plaintiff disabled from July 20, 2007 onward, but also finding plaintiff not disabled from his alleged onset date of August 18, 2004 through July 19, 2007 (R. 31-41). The Appeals Council denied plaintiff's request for review on July 22, 2008 (R. 1-3). Because the Appeals Council denied further review, the ALJ's findings constitute the findings of the Commissioner of Social Security ("the Commissioner"). 20 C.F.R. § 404.981 (2006); *see also Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994).

## II.

We begin our factual discussion with a review of the relevant medical records. In December 2003, plaintiff suffered a blunt trauma to his left thumb (R. 147). He was subsequently diagnosed with a soft tissue injury and possible complex pain syndrome in addition to "dangerously high blood pressure" (R. 149-157). On May 10, 2004, he was admitted to Silver Cross Hospital with elevated blood pressure and complaints of headaches and chest tightness (R. 160-164). Hospital physicians diagnosed him with uncontrolled hypertension and noted among other things his problems with arthritis and pseudogout[2] (R. 161-162). A chest and abdomen CT revealed aneurysmal dilation of

---

[2] Pseudogout, or pseudogout syndrome: "A hereditary and familial disorder resembling gout but differing from gout in the fact that the material deposited in the tissues and joints is composed of calcium salt crystals rather than urate . . . crystals." 5-PR Attorneys' Dictionary of Medicine 2071 (Matthew Bender & Co. 2005).

the root of the aorta extending to the aortic knob with the aorta becoming normal in size just distal to the aortic knob throughout the course of the abdomen (R. 175). The report from his June 2004 stress test noted that plaintiff suffered from supraventricular tachycardia,[3] aortic aneurysm and hypertension (R. 188).

In July 2004, plaintiff was admitted again to Silver Cross Hospital, this time with complaints of right foot pain (R. 192-194). He was diagnosed with acute gouty arthritis, severe hypokalemia,[4] and hypertension (R. 192). The next month, plaintiff was hospitalized again with complaints of right foot pain, and he was found to be suffering from acute renal failure, dehydration, hypokalemia, hypertension, and cervical spondylosis[5] (R. 204). An echocardiogram revealed a left ventricular ejection fraction of 60 percent, dilated aortic root, slightly enlarged left atrium, mild mitral regurgitation[6] and trivial tricuspid regurgitation[7] (R. 215). Plaintiff complained to hospital personnel at the time of neck pain with numbness and tingling in his face and fingers (R. 205, 221). He also complained of dizziness, back pain, and a sensation of a "popped" vertebra in the neck (R. 213). X-ray images of his chest and spine, however, were unremarkable (R. 213).

---

[3] Tachycardia: "An abnormally rapid beating of the heart. A rate faster than 100 beats per minute is regarded as tachycardia." 5-T-TG Attorneys' Dictionary of Medicine 140 (Matthew Bender & Co. 2005).

[4] Hypokalemia: "A diminished amount of potassium in the blood." 3-H Attorneys' Dictionary of Medicine 5794 (Matthew Bender & Co. 2005).

[5] Spondylosis: "An abnormal fusion or growing together of two or more vertebrae." 5-S Attorneys' Dictionary of Medicine 5636 (Matthew Bender & Co. 2005).

[6] Mitral regurgitation: "An abnormal backward flow of blood from the left ventricle into the left atrium (auricle), due to a defect in the mitral valve which controls the opening that separates the two chambers." 4-M Attorneys' Dictionary of Medicine 5009 (Matthew Bender & Co. 2005).

[7] Tricuspid regurgitation: "The abnormal backflow of blood from the right ventricle (lower chamber of heart) into the right atrium because of a defective tricuspid valve (which is situated between the ventricle and atrium). Normally, the valve permits the blood to flow only from the atrium into the ventricle." 6-TH-TY Attorneys' Dictionary of Medicine 545 (Matthew Bender & Co. 2005).

On August 27, 2004, plaintiff underwent an MRI of the cervical spine (R. 218). The MRI showed degenerative changes about the disc spaces of the cervical spine most notably at C3-4 where there was prominent bulging (R. 218). Signal changes of the disc spaces of C2-3, C4-5 and C5-6 were also noted, suggesting mild degenerative changes at those levels (*id.*). The MRI also revealed evidence of bilateral effacement of the lateral recess and neural foramina, more so on the right side than on the left (*id.*). Plaintiff subsequently underwent a CT and discography[8] of his cervical spine, which confirmed a bilateral osteopohyte formation at C3-4, and a broad based asymmetric posterior disc bulging with slight left-sided predominance (R. 226, 228).

From May to October 2004, plaintiff was treated by physicians at Heartland Cardiovascular Center for hyperlipidemia, hypertension and sleep apnea (R. 179-186). On October 20, 2004, Dr. Seif A. Martini observed that plaintiff suffered from high blood pressure and dizzy spells, and assessed his mixed hyperlipidemia,[9] benign hypertension, supraventricular tachycardia, thoracic aneurysm and sleep apnea (R. 179-180).

In December 2004, Plaintiff was hospitalized at Provena Saint Joseph Medical Center for cervical spondylosis and discogenic[10] pain at C3-4, C4-5, and C5-6 (R. 247-269). There, he

---

[8] Discography: "A diagnostic procedure used to detect and localize injured or pathological intervertebral disks. A radiopaque material is injected into the disk, or in the space around it, so that its form can be visualized by x-ray examination." 2-D Attorneys' Dictionary of Medicine 3495 (Matthew Bender & Co. 2005).

[9] Hyperlipidemia: "The presence of high levels or concentrations of lipids (fats) in the blood." 3-H Attorneys' Dictionary of Medicine 5176 (Matthew Bender & Co. 2005).

[10] Discogenic: "Originating in, or due to, an abnormality or disease of an intervertebral disk (pad of gristle between adjacent vertebrae)." 2-D Attorneys' Dictionary of Medicine 3493 (Matthew Bender & Co. 2005).

underwent an anterior cervical diskectomy,[11] bilateral foraminotomy,[12] spinal cord decompression, nerve root compression and excission of an osteophyte spur (R. 255-264). Anterior interbody arthrodesis[13] with instrumentation placement was performed at C3-6 (R. 247, 257). Plaintiff continued to be treated by Dr. George DePhillips and another doctor (whose treatment notes are unsigned) for neck pain in the several months thereafter (R. 228-244, 270-76).

On February 25, 2005, plaintiff was admitted to Provena Saint Joseph Medical Center for an extension of his cervical fusion to the C6-7 level (R. 285-292). Plaintiff's doctors, Dr. DePhillips and Dr. Hussain, had concluded that as a result of the cervical fusion, inferior screws had broken through the end plate of C-6 and were positioned in disk space of C6-7 (R. 286-287). However, the surgery had to be postponed and plaintiff was admitted for cardiology consultation due to his extremely high blood pressure (*id.*).

On March 1, 2005, plaintiff underwent a second anterior cervical diskectomy at C6-7 with exploration of the fusion at C3-4, C4-5 and C5-6, and removal of the anterior instrumentation at C3-6 due to hardware failure (R. 293-299, 317, 325-326). While hospitalized, he also underwent a CT which revealed possibly mild cardiomegaly[14] and increasing densities at the lung bases (R. 308). Over the next several months, plaintiff repeatedly visited Dr. DePhillips for treatment of recurring

---

[11] Diskectomy: "The surgical excision (cutting out) of all or part of an intervertebral disk (a disk of cartilage between two adjacent vertebrae)." 2-D Attorneys' Dictionary of Medicine 3578 (Matthew Bender & Co. 2005).

[12] Foraminotomy: "A surgical operation for the enlargement of an interverteral (*sic.*) foramen (a normal opening between two vertebrae of the spine). It is done to relieve pressure on the root of a spinal nerve, a nerve passing through an intervertebral foramen." 2-F Attorneys' Dictionary of Medicine 3300 (Matthew Bender & Co. 2005).

[13] Arthrodesis: "The surgical procedure of making a joint immovable by causing the surfaces of the bones to fuse or grow together." 1-A Attorneys' Dictionary of Medicine 10973 (Matthew Bender & Co. 2005).

[14] Cardiomegaly: "Enlargement of the heart: the condition of having an enlarged heart." 1-C Attorneys' Dictionary of Medicine 1771 (Matthew Bender & Co. 2005).

neck pain (R. 270-273). Dr. DePhillips recommended that plaintiff wear a cervical halo for three

months post surgery, which plaintiff did until June 1, 2005 (R. 272). During a June 1 visit,

Dr. DePhillips stated that plaintiff should be seen again in three weeks, and that he should remain

off of work until his next appointment, "as there [was] no light duty work available" (id.). Plaintiff

followed up with Dr. DePhillips later that month and twice in July 2005 (id.). On July 26, 2005, Dr.

DePhillips opined that plaintiff was totally disabled and that he would be so "for at least one year

and perhaps permanently" (R. 271).

On August 4, 2005 a non-examining State Agency physician, Stanley Burris, submitted a

residual functional capacity ("RFC") assessment to the Social Security Administration (R. 351-358).

Dr. Burris opined that plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds and

stand, walk or sit for about six hours in an eight-hour day, and that he had an unlimited ability to

push and/or pull (R. 352). He opined that plaintiff could occasionally climb ramps and stairs,

balance, stoop, kneel, crouch and crawl, but that he could not climb ladders, ropes or scaffolds, and

that plaintiff had limited ability to reach due to pain (R. 353-354).

On August 23, 2005, plaintiff was admitted again to Provena Saint Joseph Medical Center

with complaints of severe left groin pain (R. 359-360). On August 31, 2005, Dr. Michael P. Murphy,

opined that the pain could be emanating from the back of the hip, and referred him for a bone scan

and an MRI (R. 371). The hip MRI revealed a diffuse edema of the left femoral head (R. 373), and

the bone scan revealed mildly increased activity of the left femoral head (R. 374). Over the next

several months, plaintiff continued to be seen by Dr. DePhillips to address continuing complaints

of hip pain, severe neck pain and headaches (R. 270-271). Dr. DePhillips referred plaintiff for

6

additional diagnostic imaging, recommended cervical epidural steroid injections and prescribed him various pain medications including Percocet, OxyContin and Fentanyl suckers (*id*).

From July through September 2007, plaintiff was treated at a pain clinic for cervical radiculopathy, neck pain and neck stiffness (R. 390-395). Dr. Udit Patel examined plaintiff, noting spasms in plaintiff's right cervical paraspinal muscles, sensory deficits in the right C6 dermatomal and right C7 dermatomal distribution, a positive compression test and a positive Spurling test bilaterally (*id*.). Dr. Patel noted that plaintiff's condition had not improved with previous surgeries and that he had developed "extreme tolerance" to his pain medications, without significant change in pain with dosing (*id*.). On September 14, 2007, Dr. Patel added to plaintiff's methadone and Norco prescriptions a prescription for Pamelor to decrease neuropathic pain (R. 391). Dr. Patel further suggested that plaintiff seek treatment including injectional therapy at a free care facility since plaintiff had reported having very little money to pay for additional treatments (*id*.).

## III.

During the November 1, 2007 administrative hearing, the ALJ received testimony from plaintiff and the VE.[15] Their testimony is summarized below.

### A.

Plaintiff testified that he was born on May 20, 1958, and that his highest level of schooling was high school (R. 8-9). The last job he held before the hearing was performing building maintenance for a hospital from 2000 to around 2004 or 2005 (R. 9). In that position, his duties involved heavy lifting, walking, bending and crawling (R. 10). Prior to that, he worked as a

---

[15] The ALJ had arranged for a medical expert to be present at the hearing. However, the ALJ proceeded without him when she learned on the day of the hearing that the expert had not yet reviewed the file (R. 7).

7

salesman and as an electrician (R. 10-11). In each of these positions, plaintiff's work duties involved regular lifting and standing (*id.*).

Plaintiff testified that his most limiting problem was his neck pain and limited neck range of motion following multiple spinal fusions (R. 12-13). He explained that his pain emanates from deep in his neck and radiates down his right arm at least three to four times per day (R. 12). The pain is so extreme that it sometimes makes him scream (*id.*). Plaintiff wore a cervical collar to the hearing and testified that he wears it to avoid moving his neck much because the pain following such motions is so severe (R. 13). He testified that he has difficulty moving his arms due to pain, difficulty using his fingers due to numbness, and difficulty driving due to his limited range of neck motion (R. 13-14). His neck pain also detracts from his ability to concentrate and complete projects (R. 15).

Plaintiff additionally testified that he suffers from sleeping problems, nausea, and an aortic aneurism (R. 14-15). He gets headaches a couple of times per week, and they last anywhere from five minutes to several hours (R. 14). Plaintiff treats his headaches by lying down or reclining, icing his head and taking medicines including Norco or methadone (*id.*). He testified that he takes the medicines daily, and that they lessen but do not alleviate his pain (*id.*). He also testified that he was receiving treatment at a pain clinic at least once a month, but that it was difficult to pay for such treatment since he did not have insurance and was paying cash for the services (R. 15).

Regarding his daily activities, plaintiff testified that he usually wakes up around 4:30 or 5:00 a.m. and that although he sometimes showers right away, most of the time he has to sit and relax in a recliner chair before feeling "up to taking a shower" (R. 16). Similarly, he testified that he sometimes eats breakfast right away and that other times he reclines in a chair or in his bed until he

8

feels ready to eat (R. 16-17). He goes to church once a week for an hour-long service which sometimes causes him problems (R. 17). He testified that his girlfriend helps him with grocery shopping and does the laundry and most of the housecleaning, though he added that he does "what he can" to help her (*id.*).

**B.**

VE LeAnne L. Hare reviewed plaintiff's file and testified at the hearing (R. 18). She concluded that plaintiff had performed all of his previous positions at the heavy exertional level, despite lesser exertional classifications of those positions by the Dictionary of Occupational Titles ("DOT") (R. 18).[16] She testified that the DOT classifies plaintiff's past work as a building maintenance repair worker as medium work which is skilled in nature, his work as a generator repair person as medium work which is semiskilled in nature, his work as an electrician as medium work which is skilled in nature, and his other jobs in sales, building equipment and supplies as light work which is semiskilled in nature (*id.*).

The VE further testified that an individual of plaintiff's age who could do light work involving no overhead reaching, stair climbing, ropes or scaffolds, but involving occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching and crawling could only perform plaintiff's past skilled work as it is defined by the DOT, and not at the higher exertional level that plaintiff actually had performed the work (R. 19).[17] According to the VE, such an individual also could perform such unskilled light jobs as rental clerk, counter clerk or information

---

[16] The Social Security Administration has taken administrative notice of the DOT, which is published by the Department of Labor and gives detailed physical requirements for a variety of jobs. 20 C.F.R. § 416.966(d)(1) (2007); *Prochaska v. Barnhart*, 454 F.3d 731, 735 n. 1 (7th Cir. 2006).

[17] We note that the hypothetical the ALJ posed to the VE that elicited this testimony both included a restriction against stair climbing and an allowance for occasional stair climbing (R. 19).

9

clerk (*id.*). She further testified that an individual of the same age who could perform light and sedentary work with the same restrictions set forth above could perform such jobs as accounts clerk or order clerk (R. 19-20).[18]

If the person also was limited to only occasional use of the right arm, however, the VE testified that all sedentary work and many positions at the light level would be precluded (R. 20). Finally, although not addressed by the DOT, the VE testified based on her own experience that if the hypothetical person also had to wear a soft cervical collar that limits his ability to turn or look down, he would be "in no position" to perform any of the previously identified jobs (R. 21-22).

## IV.

The ALJ concluded that plaintiff was capable of light work with certain restrictions from the alleged disability onset date of August 18, 2004 through July 19, 2007, and that plaintiff became disabled on July 20, 2007 and continued to be disabled through the date of the hearing (R. 31). At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since his alleged disability onset date (R. 33). At step two, the ALJ found that since the alleged onset date, plaintiff had the severe impairments of status post multiple cervical fusions, hypertension, headaches, status post aneurysm, and degenerative joint disease (*id*). She further held that "[t]hese impairments cause significant limitations in [plaintiff's] ability to perform basic work activities" (*id.*). At step three, the ALJ concluded that none of plaintiff's impairments met or medically equaled a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (*id.*).

---

[18] The VE testified that such a person also could perform one other position, but the testimony was inaudible and thus is not discernible in the transcript (R. 20).

10

The ALJ next determined that from plaintiff's alleged disability onset date to July 20, 2007, he was capable of performing light work that did not require climbing ladders, ropes or scaffolds, reaching overhead, working at heights or around moving machinery, or more than occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching or crawling (R. 34). To support this finding, the ALJ recited many of plaintiff's medical records and the opinions of the state agency medical consultants (R. 34-37). The ALJ declared that she "accept[ed] the State agency's assessment that [the plaintiff] can perform work at the light exertional level prior to July 20, 2007," and added that she "would further limit [the plaintiff] to no overhead reaching due to neck pain, and to no working at heights or around moving machinery due to the effects of hypertension and degenerative disc disease" (R. 37).

In assessing plaintiff's RFC, the ALJ drew two distinct conclusions with regard to plaintiff's credibility (R. 34-39). She first found that although plaintiff's medically determinable impairments could reasonably be expected to produce his alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were "not entirely credible prior to July 20, 2007" (R. 34-35). The ALJ cited three issues with plaintiff's "testimony, reports and allegations" to support her finding (R. 37).

*First*, the ALJ noted that although plaintiff had declared in a July 27, 2005 agency questionnaire that he does not perform chores like cleaning, making beds and doing laundry, he testified at the hearing that he does do some housecleaning (*id.*). *Second*, she noted that although plaintiff had indicated in an October 14, 2005 agency form that he was unable to stand in the shower, he testified at the hearing that he showers in the morning and he did not testify that he needs assistance with showering or that he uses a chair while showering (R. 37-38). *Third*, she observed

11

that although plaintiff declared in a February 11, 2006 agency form that his neck pain had increased and that the medications were not as effective in controlling the pain, a medical report from six months prior to that stated that he had reported that his pain medication was "too strong" (R. 38). The ALJ further supported her credibility determination for this period of time by noting "the absence of medical records, treatment records and objective findings from 2006 and thereafter up through July 19, 2007" (*id.*).

The ALJ also found, however, that "beginning on July 20, 2007, [plaintiff's] allegations regarding his symptoms and limitations are generally credible" (R. 38). She concluded that beginning on July 20, 2007, plaintiff had the residual functional capacity to perform light work that did not require climbing ladders, ropes or scaffolds, reaching overhead, working at heights or around moving machinery or more than occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, crawling, reaching or handling (R. 39). In making this finding, she held that the evidence before July 20, 2007 did not demonstrate "significant right arm limitations" and that plaintiff's testimony regarding a "deterioration of his condition and with respect to his physical limitations effective July 20, 2007 and thereafter" had been persuasive (R. 38-39). She pointed to Dr. Udit Patel's July 20, 2007 treatment note describing, among other things, plaintiff's cervical radiculopathy with pain radiating down plaintiff's right arm, forearm and hand, plaintiff's testimony regarding arm pain and weakness, and plaintiff's use of a cervical collar to help keep his neck straight (R. 38). Further, she noted that Dr. DePhillips had opined on June 1, 2005 that plaintiff should remain off of work until his next appointment because there was "no light duty available," and that Dr. Mauricio Orbegozo's October 2005 treatment note did not reflect any complaints from

12

plaintiff of upper extremity radicular pain (*id.*).[19] She again pointed to the lack of treatment records and objective findings from 2006 until July 2007 (*id.*).

At step four, the ALJ found plaintiff unable to perform any past relevant work since his alleged disability onset date (R. 39). She noted that the VE had testified that although the DOT categorized the work differently, plaintiff had performed each of his previous work positions at the heavy exertional level and he no longer could do so, adding, however, that before July 20, 2007, he could have performed the semi-skilled position of sales representative if performed at the light exertional level as classified by the DOT (*id*).

Turning to the Medical-Vocational Guidelines ("the Grid"), the ALJ found that plaintiff was 46 years old at the alleged disability onset date and was thus a "younger" person as that term is used in the Code of Federal Regulations (*id.*).[20] She noted that plaintiff has at least a high school education and the ability to communicate in English and explained that prior to July 20, 2007, transferability of job skills was not material to the disability determination since the Grid would support a finding that plaintiff was not disabled regardless of any transferable job skills (*id.*).

Because the ALJ found that plaintiff has additional limitations not considered by the Grid, however, she did not solely rely on it in making her conclusions (R. 40). Rather, she looked to the VE's testimony that an individual with plaintiff's limitations from his alleged disability onset date through July 19, 2007 could perform certain sedentary jobs and certain work in the light exertional category (*id*). Also consistent with the VE's testimony, the ALJ further found that beginning on July

---

[19] The ALJ characterized the October 24, 2005 record as "just nine months prior" to the July 20, 2007 report (R. 38); however, we note that the records are dated one year and nine months apart (R. 375, 394).

[20] The Grid is a chart based on major functional and vocational patterns which works to classify a claimant as disabled or not disabled based on the claimant's age, education and work experience in combination with the individual's RFC. 20 C.F.R. Pt. 404, Subpt. P, App. 2.

20, 2007, plaintiff's additional limitations, primarily manipulative restrictions, prevented him from performing any job in the national economy (R. 41). She therefore held that although plaintiff was not disabled prior to July 20, 2007, he became disabled on that date and continued to be disabled through the date of her decision (*id.*).

## V.

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2004). To support a claim of disability, the claimant must demonstrate that his impairments prevent him from performing not only his past work but also any other work that exists in significant numbers in the national economy. 42 U.S.C. § 423 (d)(2)(A).

The Social Security Regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a) (2006). Under the Regulations, the Commissioner must consider: (1) whether the claimant has performed any substantial gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the RFC to perform his past relevant work; and (5) if the claimant cannot perform his past relevant work, whether he is unable to perform any other work existing in

14

significant numbers in the national economy. *See id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (internal quotations omitted). An affirmative answer at steps one, two or four leads to the next step. *Zurawski*, 245 F.3d 886 (internal quotations omitted). An affirmative answer at steps three or five requires a finding of disability, whereas a negative answer at any step other than step three precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one to four, and if that burden is met, the burden at step five shifts to the Commissioner to establish that the claimant is capable of performing work existing in significant numbers in the national economy. 20 C.F.R. § 404.1560(c) (2006); *Zurawski*, 245 F.3d 886.

When a claim for disability benefits cannot be evaluated based on medical considerations alone, the Commissioner may employ the Grid to assist in assessing the claimant's ability to engage in substantial gainful activity. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. The Commissioner's analysis at step five typically involves an evaluation of the claimant's RFC to perform a particular category of work (*e.g.*, sedentary, light, medium, heavy or very heavy work), in combination with an application of the Grid to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. *See id.* The Grid is to be applied only when it accurately describes the claimant's abilities and limitations. *Heckler v. Campbell*, 461 U.S. 458, 462 n.5 (1983). If the claimant's capabilities are not described accurately by a Grid rule, or are only described only with borderline accuracy, the Regulations make clear that the claimant's particular limitations must be considered. *Id.* (citing 20 C.F.R. Pt. 404, Subpt. P. App. 2. § 200.00 (a), (d) and 20 C.F.R. § 404.1563 (a)).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors the ultimate conclusion. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Herron*, 19 F.3d at 333. Where there is a conflict between medical opinions, the ALJ may choose between those opinions, but she may not substitute her own lay opinion for that of medical professionals. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Although the ALJ is not required to discuss every piece of evidence, she must build an accurate and logical bridge between the evidence and the conclusion. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). "An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis" such that the ALJ's reasoning can be followed. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (internal citations omitted). "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

In reviewing the decision of the Commissioner, the Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron*, 19 F.3d at 333. Rather, we must accept the findings of fact which are supported by "substantial evidence." 42 U.S.C. § 405(g). "Evidence is 'substantial' if it is sufficient for a reasonable person to accept as adequate to support a conclusion." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (quoting *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002)).

## VI.

Plaintiff brings several challenges to the ALJ's decision that he was not disabled from August 18, 2004 through July 20, 2007. *First*, he argues that the ALJ erred in rejecting without comment the opinion of plaintiff's treating physician that plaintiff was disabled during part of the period in which the ALJ found that he was not disabled (Pl.'s Mem. at 18-19). *Second*, plaintiff argues that

the ALJ erred in discrediting plaintiff's testimony on the basis of alleged inconsistencies in his statements and on a lack of medical records (*id.* at 14-18). *Third*, he argues that the ALJ erred in determining plaintiff's RFC by failing to fully consider plaintiff's testimony, failing to consider all of plaintiff's impairments, and failing to consider the combined impact of plaintiff's impairments on his ability to work (*id.* at 11-14). *Finally*, plaintiff argues that the ALJ erred in accepting the VE's testimony as a basis for her decision without ensuring that the VE's testimony was consistent with the DOT (*id.* at 19-20).

The Commissioner argues in response that the ALJ's decision is supported by substantial evidence and that the ALJ properly chose from Dr. DePhillips' conflicting opinions the one for which she found support in the record (Deft.'s Resp. at 11-13). Noting that the ALJ's credibility determination should only be overturned if patently wrong, the Commissioner argues that the ALJ's credibility determination was proper given plaintiff's lack of medical evidence supporting his claimed disability from his alleged onset date (*id.* at 10-11). The Commissioner further argues that the ALJ's RFC decision was proper since plaintiff failed to submit sufficient evidence of disability for the claimed period of time and failed to demonstrate that ailments not specifically addressed by the ALJ further limited plaintiff's ability to work (*id.* at 9-10). Finally, the Commissioner argues that the ALJ's failure to specifically ask the VE whether her testimony was consistent with the DOT was harmless because the VE's testimony included references to the DOT as well as distinctions from it, and as such, the ALJ was able to consider and resolve possible conflicts (*id.* at 13).

## A.

As set forth above, Plaintiff argues that the ALJ's decision can not stand because the ALJ failed to consider the July 26, 2005 opinion of plaintiff's treating physician, Dr. DePhillips, who

17

opined that plaintiff was totally disabled and that he could not return to work for at least one year if not permanently (Pl.'s Mem. at 18-19; Pl.'s Reply at 6-8). Although the ALJ did not specifically mention the opinion, the Commissioner nevertheless asserts that she considered and rejected it in favor of Dr. DePhillips' June 1, 2005 opinion that plaintiff would remain off work for one month because "no light work [was] available" (Deft.'s Resp. at 11-12).

The Commissioner's argument is unavailing. Though the ALJ need not mention every piece of evidence, neither may she simply select and discuss only the evidence which favors her ultimate conclusion. *Zurawksi*, 245 F.3d at 888; *Herron*, 19 F.3d at 333. An ALJ's decision must be based upon consideration of all the relevant evidence and must articulate "at some minimal level" the ALJ's analysis of the evidence. *Herron*, 19 F.3d at 333. Here, the ALJ's decision does not indicate that she considered the later opinion of Dr. DePhillips at all, let alone that she found his opinions to be conflicting and that she chose to weigh one above the other in making her decision (R. 31-41).

20 C.F.R. § 404.1527(d)(2) (2006) provides in pertinent part that an ALJ must "always give good reasons . . . for the weight [given to a] treating source's opinion." Further, "[a] treating physician's opinion about the nature and severity of the claimant's impairment is normally given controlling weight so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is consistent with substantial evidence in the record." *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

In *Moss*, the court found error in the ALJ's acceptance of one opinion over another without due consideration of the factors outlined in the Regulations. *Moss*, 555 F.3d at 560-561. As the *Moss* court explained, "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature and extent of the treatment relationship,

18

frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Id.* at 561. "An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Skarbek*, 390 F.3d at 503 (internal citations and quotations omitted).

In this case, the ALJ failed to provide any insight into how she evaluated Dr. DePhillips' June 1 and July 26, 2005 opinions or whether she considered them in conjunction with the factors set out in the Regulations. Although the ALJ recited at length the medical evidence, she did not cite to – much less discuss – Dr. DePhillips' July 26, 2005 note. The ALJ's discussion skips from Dr. DePhillips' June 1, 2005 progress note to his August 30, 2005 note. Thus, we do not know if the ALJ simply overlooked the July 25, 2005 note; or, if the ALJ engaged in improper picking and choosing to mention only supportive evidence and to ignore the rest, *see Indoranto*, 374 F.3d at 474; or, if she considered the June 1 and July 26, 2005 notes to be conflicting, why she credited the June 1 note and not the July 26 note. The Commissioner's after-the-fact argument can not substitute for the analysis that the ALJ should have performed. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ"). On this basis alone, remand is required.

## B.

The ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [plaintiff's] statements concerning the intensity,

persistence and limiting effects of these symptoms are not entirely credible prior to July 20, 2007"

(R. 35). As set forth more fully in Section IV above, the ALJ relied in part on this negative

credibility assessment to find that plaintiff was not disabled from his alleged disability onset date,

August 18, 2004, through July 19, 2007 (R. 34-37). Plaintiff argues that in making this credibility

determination, the ALJ did not comply with SSR 96-7p, failed to consider and evaluate certain

medical evidence in the record, and failed to perform a proper pain assessment using the factors set

forth in *Zurawski*, 245 F.3d at 887-888 (Pl.'s Mem. at 14-18; Pl.'s Reply at 4-6). The Commissioner

argues in response that the ALJ correctly relied on the lack of medical records for much of the

relevant time period in finding plaintiff's complaints less than credible (Deft.'s Resp. at 10-11).

SSR 96-7p declares in pertinent part:

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186 at *2. Once it is established that the claimant has a medically

determinable impairment that could reasonably be expected to produce the alleged symptoms,

including pain, the ALJ is required to evaluate the claimant's subjective complaints of pain in

determining whether she is disabled, considering both the objective medical evidence as well as any

additional information provided by the claimant, her treating physician or others. 20 C.F.R. §

404.1529 (2006).

In interpreting this rule, the Seventh Circuit Court of Appeals has explained:

> If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a

significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

*Zurawski*, 245 F.3d at 887 (quoting *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)). An ALJ's credibility determination will be upheld if the ALJ "gave specific reasons for the finding that are supported by substantial evidence." *Moss*, 555 F.3d at 561.

In making her credibility determination, the ALJ itemized the rules governing her analysis and recited many of plaintiff's medical records. But merely reciting records is not the same thing as analyzing them. Here, the ALJ failed to provide any insight into how she evaluated those records or whether she followed the required analysis. Instead, she stated only that she had considered the "evidence of record" without explaining why the medical evidence was inconsistent with the level of pain and limitation plaintiff described (R. 35). Clearly, it is not enough for the ALJ simply to recite the factors that are described in the Regulations for evaluating symptoms and to recite the medical records without any discussion of their weight. *See Zurawski*, 245 F.3d at 887-888. The ALJ's findings must be specific enough to enable the claimant and a reviewing court to understand the ALJ's reasoning. *Id.* at 888. As the Seventh Circuit has consistently directed, the ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford*, 227 F.3d at 870 (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)).

The ALJ also supported her decision to discredit plaintiff's claimed level of pain and limitation by specifically noting three inconsistencies in his statements: (1) plaintiff testified at the hearing that he "does do some housecleaning," despite his earlier questionnaire response that he does not do chores "like cleaning, making beds, and doing laundry"; (2) plaintiff testified at the hearing that he "gets up at 4:30 a.m. or 5:00 a.m., takes a shower and eats breakfast," despite an earlier statement that he is unable to stand in the shower; and (3) plaintiff reported in an agency form that his neck pain had increased and that medications were not as effective in controlling his pain despite a doctor's note from "just six months prior" that reported that he had complained that his pain medication was too strong (R. 37-38).

Though the Commissioner correctly notes that the ALJ's credibility determination is afforded deference and should not be overturned unless "patently wrong," *Skarbek*, 390 F.3d at 504, where the credibility determination is based on objective factors rather than subjective considerations, the ALJ is in no better position than the court and the court has greater freedom to review it. *See Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008); *Indoranto*, 374 F.3d at 474. Here, the ALJ's credibility determination was based on objective factors that are not supported by the record.

*First*, the ALJ incorrectly paraphrased plaintiff's testimony about housework (R. 37). Contrary to the ALJ's conclusion, plaintiff did not testify that he does the housecleaning when he earlier said he did not. Rather, in response to the ALJ's question about housecleaning, plaintiff testified "I do what I can, but again most of it's done by [my girlfriend]" (R. 17). Without following up to explore what plaintiff meant by that testimony, the ALJ lacked a basis to conclude that his testimony was inconsistent with his earlier questionnaire response.

*Second*, plaintiff's hearing testimony about showering was not in contradiction to his earlier questionnaire response. Rather, plaintiff testified at the hearing that his daily routine changes depending on how he feels, stating, "Sometimes I can get a shower right away, but most of the time I just have to sit and relax in a recliner for a while until I feel up to taking a shower" (R. 16). Plaintiff was not asked whether he uses an assistive device in the shower, and he did not testify one way or another as to this point (R. 16-17).

*Third*, plaintiff's statement in an agency form about increased neck pain and decreased medication efficacy (R. 135) is not inconsistent with the earlier medical record noting plaintiff's report that his medication, oxycontin, was "too strong" (R. 244). Here too, plaintiff was not asked for an explanation of this comment. As plaintiff correctly points out, the ALJ's assumption that "too strong" necessarily means "too effective" is a conclusion not supported by the medical evidence (Pl.'s Mem. at 17). Indeed, the same form that the ALJ cited also included plaintiff's statement that oxycontin makes him tired (R. 137). Similarly, no explanation is provided in the medical record for the earlier statement that the medication was "too strong" (R 244).

Lastly, the ALJ noted – without substantive discussion – "the absence of medical records, treatment records, and objective findings from 2006 and thereafter up through July 19, 2007 (R. 38). Infrequent treatment or a failure to follow a treatment plan may support a negative credibility finding where the claimant does not have a good reason for the failure or the infrequency of treatment. SSR 96-7p, 1996 WL 374186 at *8. However, the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other

23

information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Id.*; *see also Moss*, 555 F.3d 562; *Craft*, 539 F.3d at 679.

In this case, the ALJ erred by relying on a gap in plaintiff's medical records to discredit him without exploring the circumstances. The record indicates that plaintiff had complained to at least one of his physicians about an inability to afford medical treatments (R. 391), and plaintiff testified before the ALJ that he was paying cash for treatment at a pain clinic "because [he doesn't] have insurance now and it's difficult to be able to afford the rates that they charge" (R. 15). The ALJ did not question plaintiff about any lack of insurance coverage, or any other reason that might explain an earlier gap in treatment. Upon remand, the ALJ should explore plaintiff's explanations as to any lack of medical care (in particular, in the 2006 to July 2007 time-frame) before drawing a conclusion about plaintiff's credibility based on it.

## C.

Because we find the ALJ's decision deficient upon a number of grounds as set forth above, we need not rule on plaintiff's remaining arguments. We do, however, make the following observations to provide guidance to the parties on remand.

*First*, plaintiff argues that the ALJ erred in her RFC determination by failing to consider plaintiff's additional impairments of gout, sleep apnea, and arthritis, and by failing to consider his testimony that he suffers from headaches and an aneurysm that prevents him from lifting more than 10 pounds and that he has to sit in a recliner to alleviate his pain (Pl.'s Mem. at 11-14; Pl.'s Reply at 1-4). The Commissioner argues in response that the ALJ's RFC determination is supported by substantial evidence and that the ALJ correctly found persuasive plaintiff's lack of medical evidence supporting his alleged disability from August 18, 2004 through July 19, 2007 (Deft.'s Resp. at 9-10).

24

We note that the ALJ did not explain in her RFC determination whether she considered the testimony to which plaintiff points or how she weighed the medical evidence, including evidence of plaintiff's gout, sleep apnea or arthritis (R. 34-39). In determining what a claimant can do despite his limitations, the ALJ must consider the entire record, including all relevant medical and nonmedical evidence, as well as the claimant's own statements of what he is able or unable to do. 20 C.F.R. § 404.1545(a) (2006); *Craft*, 539 F.3d at 676. In making an RFC determination, the ALJ must articulate "at some minimal level" her analysis of the evidence in order to permit an informed review. *Zurawski*, 245 F.3d at 888 (quoting *Clifford*, 227 F.3d at 872). We further note, however, that although plaintiff complains that the ALJ failed to consider his aneurysm, sleep apnea and gout, plaintiff has not pointed to any evidence suggesting that he has suffered an increased level of impairment as a result of these conditions. Indeed, plaintiff testified at the hearing that he does "not have problems with gout" (R. 15). If there is such evidence in the record, plaintiff should bring it to the ALJ's attention upon remand.

*Second*, plaintiff argues that the ALJ erred by failing to ask the VE whether her testimony was consistent with the DOT as she was required to do by SSR 00-4p (Pl.'s Mem. at 19; Pl.'s Reply 8-10). The Commissioner argues in response that the ALJ's omission is harmless because the VE's testimony was expressly informed by the DOT, and any distinctions from it were clear in her testimony (Deft.'s Resp. at 13). We note that regardless of whether any conflicts with the DOT were adequately explored during the hearing, the ALJ did not "explain in the determination or decision how . . . she resolved the conflict," as she was required to do under the Regulations. SSR 00-4p, 2000 WL 1898704 at *4. Upon remand, the ALJ should take care to explain her analysis.

## CONCLUSION

Plaintiff has requested that the Commissioner's determination be reversed outright and that the Commissioner be ordered to grant plaintiff's disability benefits. Although the ALJ's decision is flawed as discussed above, on this record remand rather than an award of benefits is in order. For the foregoing reasons, plaintiff's motion for summary judgment (doc. #12-2) is granted and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated:** August 13, 2009